(13 Misc. Rep. 626.)

### SNYDER v. GARDNER.

#### (Superior Court of Buffalo, General Term. July 29, 1895.)

PRINCIPAL AND AGENT—RATIFICATION—HUSBAND AS WIFE'S AGENT.

    Defendant's husband purchased goods from plaintiff, saying that they were for defendant, and defendant took possession and paid part of the price, and afterwards, when payment of the balance was demanded, said she wished to keep the goods, and that she would pay for them. There was no evidence that the husband had authority to purchase goods for defendant. *Held,* that defendant ratified the husband's act in purchasing the goods for her. Hatch, J., dissenting.

Appeal from trial term.

Action by Emma J. Snyder against Susie A. Gardner for price of goods sold. There was a judgment in favor of plaintiff, and defendant appeals. Affirmed.

Argued before TITUS, C. J., and HATCH, J.

J. W. Russell, for appellant.

Cunneen & Coatsworth, for respondent.

TITUS, C. J.    This action was originally brought in the municipal court, and a new trial had in this court by a jury, which resulted in a verdict in favor of the plaintiff, and the defendant appeals from a judgment entered thereon, and from the order denying her motion for a new trial. The complaint alleges that the plaintiff sold and delivered to the defendant a harness and other articles, amounting to $68, and that $10 has been paid, and demands judgment for $58. The answer is a general denial. No defense was made by the defendant on the trial, and the case rests upon the plaintiff's evidence.

It appears that the defendant is the wife of William A. Gardner. It is claimed by the defendant that there is no evidence that the property in question was sold to the defendant, or that her husband acted as her agent in making the purchase, which presents the only question in the case. The evidence is brief, being given by the plaintiff and her daughter. The plaintiff testifies that on the 12th day of August, 1893, William A. Gardner called at the office of Beck & Snyder—

"And said his wife wanted a new side-bar phaeton and harness, whip, bit, and mat. He said he had one he was not satisfied with, and would like to get another. * * * I told him we didn't keep harnesses there. He said: 'You have a harness on your horse that suits my wife. I would like one like it. It is just what my wife wants.' I said: 'I will get you one on approval, and if satisfactory to her she can pay for it.' I did get Blakeslee and Koch to send the things up. The harness was to be $60, the whip $4, bit $1, mat $3. It was sent down on approval. It was perfectly satisfactory, and they were to pay for it when they took it away. Mrs. Gardner took those goods into her possession, and still has them. At that time the firm of Beck & Snyder were not engaged in selling harnesses. Their business consisting solely in manufacturing and selling carriages, wagons, and buggies. My husband was not present at the time."

The bill of the goods was shown the witness, and she said:

"That is the bill for the goods purchased by me from Blakeslee & Koch. I have received from Mrs. Gardner to apply on this account $10. There is a balance of $58 due me. On the 25th of October I called at Mrs. Gardner's house. I saw and had a conversation with her. I asked her if the carriage that stood in front of the house that day was the one we sold her. She said it was. I told her I was the lady that sold her the harness, and I wanted the money. She said that she didn't have the money, but she should arrange to pay it. She wanted to keep them and pay for them. She said she had used them so long she would make some arrangements to pay for them; if she didn't pay all at once, she would part. Mr. Gardner came in and said, 'You will have to do something; you can pay on the 5th $25,'—and she asked if that was satisfactory. I said, 'Yes.' I called on Monday, the day after the 5th, and no one was at home. * * * Mr. Gardner didn't make that payment of $25 to me, and nothing has been paid, except the sum of $10, to apply on this bill. The sum of $58 is now owing me, with interest. At the time these goods were sold, I didn't know anything about the financial standing of Mrs. Gardner. I understood from Mr. Beck that Mr. Gardner had a small account at the store. He was to pay for the goods when he took them. I wasn't there when he took them. He came and got them himself."

Fannie E. Curtin, the plaintiff's daughter, testified that she went with her mother to the house of the defendant:

"We went into the hall, and met Mrs. Gardner and talked with her. There was a carriage standing at the door. My mother said, 'Is that your harness and carriage and things down there?' And Mrs. Gardner said, 'Yes.' And my mother said, 'Mrs. Gardner, I came to demand the harness and things or

my pay.' She said, 'I can't pay you now, but I will keep the things and will pay for them.' Then Mr. Gardner stepped out and said, 'Mrs. Snyder, my wife wants to keep the harness. She will pay you, but she hasn't the money now. If you stop at the house on the 5th of November, she will give you $25. If she can, she will pay it all at once.' "

On the cross-examination she makes some statements that may or may not throw additional light on the question. She says, at the same time he bought this harness, he bought a carriage, and gave a New York draft for it: At the time she went to defendant's house—

"She said she wanted to keep the harness, didn't want to give it up, and that she would pay for it. She called Mr. Gardner, and the arrangement between them was that they were to pay if possible. He told her to pay for them, and she said she would. She would either pay all or $25 on the 5th of November. I should call at the house and get it."

She says she never had done business of this kind before she went to the firm of Blakeslee & Koch to get this stuff. Beck & Snyder never bought anything of Blakeslee & Koch. She had purchased things there before, and she paid for these goods in part. She says:

"I paid fifteen dollars on these goods. I paid personally. The bill for these goods was not made out to Beck & Snyder."

She does not know to whom they were delivered, and never saw the defendant in relation to the goods until October 25th. The bill for the goods was made out July 26th. This is all of the evidence there is in the case. In making this sale, did the husband act as the agent of the defendant?

It is a familiar rule that agency may be established by direct proof, or by the subsequent acts of the principal in ratifying the act of the agent, but the business must nevertheless be done for the principal, and any promise to pay for the goods purchased by another, in the absence of an agency, would be void. It is the claim of the plaintiff that Mr. Gardner, at the time he made this purchase, was acting for his wife, the defendant, and whether he was expressly authorized by her to purchase the harness or not, her subsequent conduct in accepting the purchase, and keeping it after knowledge of that fact, and agreeing to pay for it, was a ratification of his acts. Rogers v. Kneeland, 10 Wend. 219.

I am inclined to take this view of the case. It may be conceded that Gardner's declaration that he was buying the harness for his wife would not, standing alone, be any evidence, in an action against the defendant, of his agency (Marvin v. Wilber, 52 N. Y. 270), but it is competent as part of the res gestæ, when followed by subsequent acts of ratification, and certainly, under the authorities, her acts were sufficient to ratify the purchase of the harness by her husband, if she knew what the facts were. She probably did know. She had ample means of learning. Her husband was present when this conversation took place, and took part in it, and she assumed to know what had been done, and assented to the purchase, saying that she wanted to keep them, and would pay for them. It was incumbent on her to resort to such means of information as were rea-

sonably within her reach. She did not question her husband, did not seem surprised that the plaintiff claimed the sale was made to her, and made a demand upon her to pay for it, but, on the contrary, said she would pay for the harness.

It is elementary that, when the principal is informed of the acts of his agent, of what has been done, he must express his dissent within a reasonable time; otherwise, his assent will be presumed. Cairnes v. Bleecker, 12 Johns. 300. I have not overlooked the rule that, before the principal can be held to have ratified "the unauthorized act of an assumed agent," he must have full knowledge of the facts, so that it can be said he intended to ratify the act. Trustees v. Bowman, 136 N. Y. 521, 32 N. E. 987. But here there is no evidence that the act of Gardner in purchasing the harness was the act of an assumed agent, or that the purchase was unauthorized. In those cases in which this rule has been applied, the acts of the agent are shown affirmatively to be assumed and unauthorized. But no such question is in this case. The fair presumption from all of the evidence is that he was authorized to act, and no one disputes it, and that it was not without her knowledge that this purchase was made. The jury had the witnesses before them, and I do not think it can be said as matter of law that there was no evidence from which they might find the defendant liable by reason of her ratification of her husband's acts in buying the property.

The judgment and order should be affirmed, with costs.

HATCH, J., dissents, upon the ground that the evidence is insufficient to establish agency of the husband to bind the wife, or of knowledge sufficient to authorize a finding that she subsequently ratified his acts.

Affirmed by divided court.